**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sherri Lynn Mayhew, | No. CV-19-0232-TUC-BGM |
| Plaintiff, | |
| v. | **ORDER** |
| Andrew Saul, | |
| Commissioner of Social Security, | |
| Defendant. | |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 14). Defendant filed his Answering Brief ("Response") (Doc. 15), and Plaintiff filed her Reply (Doc. 18). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. §§ 405(g). Compl. (Doc. 1). The United States Magistrate Judge has received the written consent of both parties and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

## I.   BACKGROUND

### A.   *Procedural History*

On August 20, 2015, Plaintiff protectively filed a Title II application for Social Security Disability Insurance Benefits ("DIB") alleging disability as of May 1, 2013 due to osteoarthritis in her right knee, hyperthyroid, chronic pain, asthma, depression, sleep apnea, insomnia, anxiety, high blood pressure, and high cholesterol.[1]  *See* Administrative

---

[1] Subsequently, Plaintiff modified her alleged onset date to July 14, 2015.  AR at 25, 50,

Record ("AR") at 25, 27, 72–74, 85–86, 101, 166, 191, 228, 239.  The Social Security Administration ("SSA") denied this application on December 8, 2015.  *Id.* at 25, 72–84, 105–09.  On December 31, 2015, Plaintiff filed a request for reconsideration, and on April 5, 2016, SSA denied Plaintiff's application upon reconsideration.[2]  *Id.* at 25, 85–101, 110–13.  On April 26, 2016, Plaintiff filed her request for hearing.  *Id.* at 25, 114–16.  On September 26, 2017, a hearing was held before Administrative Law Judge ("ALJ") John Michaelsen.  *Id.* at 25, 44–71.  On December 6, 2017, the ALJ issued an unfavorable decision.  AR at 22–37.  On February 7, 2018, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on October 19, 2018, review was denied.  *Id.* at 7–11, 165.  On August 23, 2019, Plaintiff filed this cause of action.  Compl. (Doc. 1).

### B.  Factual History

Plaintiff was sixty (60) years old at the time of the administrative hearing and fifty-eight (58) at the time of the alleged onset of her disability.  AR at 25, 63, 72–74, 85–86, 101, 151, 166, 176, 191, 228, 239.  Plaintiff obtained a high school diploma.  *Id.* at 63, 66, 72, 181, 331.  Prior to her alleged disability, Plaintiff described worked as an eligibility specialist, a receptions/administrative specialist, an event receptionist, an administrative specialist/case aide, an administrative assistant, and a customer service manager.  *Id.* at 63–65, 182, 206–19, 262, 331.

#### 1.  **Plaintiff's Testimony**

##### a.  **Administrative Hearing**

At the administrative hearing, Plaintiff testified that her alleged onset of disability was July 14, 2015.  AR at 52.  Plaintiff explained that she worked until that date, having provided two weeks' notice to her employer.  *Id.* at 53.  Plaintiff further testified that her mobility had been impacted and her right knee was causing pain.  *Id.*  Plaintiff also testified that she had previously had a total replacement of her left knee, but her right knee pain

---

52, 176.

[2] The ALJ reported the reconsideration date as April 6, 2016; however, the Disability Determination Explanation at the Reconsideration level was signed on April 5, 2016.

1    necessitated keeping her foot elevated with ice on her knee and caused her to lose mental

2    focus. *Id.* at 53–55. Plaintiff discussed feeling increased stress during this period which

3    exacerbated her loss of mental acuity, as well as her physical pain. *Id.* at 53–54.

4        Plaintiff testified that her arthritis is affecting her back, neck, and shoulders, in

5    addition to her knees. AR at 59–60. Plaintiff further testified that her knee and right

6    shoulder pain negatively impact her sleep due to pain that wakes her up. *Id.* at 60. Plaintiff

7    reported that her doctor opined that the pain in her back, hip, neck, and shoulder is a result

8    of bulging disks and degenerative arthritis in her spine. *Id.* Plaintiff also testified that she

9    is unable to lift more than five (5) pounds. *Id.* Plaintiff noted that she had weight loss

10   surgery in 2009. *Id.* at 60–61.

11       Plaintiff testified that her physical therapist directed her to use a cane and confirmed

12   that she continues to take anti-inflammatory medication for her hips, back, and knee. AR

13   at 55–56. Plaintiff also indicated that she uses a TENS unit for pain management, does

14   water aerobics, and receives regular massages. *Id.* at 56. Plaintiff testified that she lives

15   in a home with her husband, who works as a longshoreman. *Id.* at 57. Plaintiff described

16   her typical day as waking up, staying in bed until any nausea resolves, getting up, taking

17   her medication, using the bathroom, and letting the dogs out. *Id.* Plaintiff testified that she

18   and her husband had a doggy door installed to allow the dogs to go in and out unassisted.

19   AR at 57. Plaintiff also testified that she usually eats something easy for breakfast, such

20   as a protein shake, then sits in her recliner alternating ice and heat on her knees and browses

21   Facebook on the computer. *Id.* at 57–58. Plaintiff reported that she also goes to the pool

22   and receives massages. *Id.*

23       Plaintiff confirmed that she has a driver's license and is able to do light shopping at

24   the store, but that her husband does the larger shopping trips. *Id.* at 52, 58. Plaintiff also

25   confirmed that she is able to drive to doctors' appointments and the pool. *Id.* at 58. Plaintiff

26   testified that she can perform light household chores, including dusting, making the bed,

27   and doing the laundry and dishes; however, her husband does the vacuuming and mopping.

28   AR at 58–59. Plaintiff testified that she and her husband do not participate in activities

outside of the home much because she has had issues with incontinence. *Id.* at 59. Plaintiff further testified that she and her husband used to attend church regularly, but are no longer consistent attendees. *Id.*

### b. Administrative Forms

#### i. *Function Report—Adult*

On September 8, 2015, Plaintiff completed a Function Report—Adult. AR at 194–205. Plaintiff reported that she lived in a house with family. *Id.* at 194. Plaintiff provided a detailed description of the history of her conditions and their impact on her work, stressing that the chronic pain, stiffness, and inflammation in both of her knees coupled with the depression, stress, and anxiety these conditions have caused have severely limited her ability to work. *Id.* at 202–04. Plaintiff also noted that her age impacts her ability to be retrained and she struggles with a loss of focus and memory. *Id.* at 202. Plaintiff described her typical day to include fatigue due to chronic insomnia linked to the pain in her knees, upon waking she eats a simple breakfast, then spends time in her recliner or bed alternating heating and icing her knees and browsing the internet. *Id.* at 195, 205. Plaintiff noted that she is able to shower, perform personal hygiene, and dress and perform light housework before returning to the recliner. AR at 196, 205. Plaintiff reported caring for her three (3) dogs, but her husband takes them out and for walks. *Id.* at 195.

Plaintiff also reported that she uses pill boxes to assist her with her medications and is limited to preparing easy food. *Id.* at 196. Plaintiff indicated that she is able to grocery shop, but only for a limited number of items or duration. *Id.* at 197. Plaintiff denied having any issues with money; however, noted that memory loss and stress requires her to spend additional time verifying that bills have been paid and her accounts balanced. *Id.* at 198. Plaintiff listed watching television, computer activity, travel, exercise, swimming, walking, cooking, and reading as her hobbies and interests, but noted that she is currently very limited with exercise, cooking, and travel due to her mobility issues and pain. AR at 198. Plaintiff reported that she was previously a very social, outgoing person, but her pain has limited to primarily the computer or telephone, and does not leave her house for activities.

*Id.* at 198–99.  Plaintiff noted that due to her pain, she prefers to spend time alone.  *Id.* at 199.

Plaintiff reported that her conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, and get along with others.  *Id.*  Plaintiff further reported that she can only walk for four (4) minutes, stand for two and a half (2 1/2) minutes, sit for thirty (30) minutes, and focus for five (5) minutes.  *Id.*  Plaintiff indicated that she forgets what she is talking about and falls asleep and has trouble following written and spoken instructions.  AR at 199.  Plaintiff reported that she has difficulty with micro-managers and controlling people and has never been fired.  *Id.*  Plaintiff further reported that she is not good with handling stress or changes in routine.  *Id.* at 200.  Plaintiff noted that she has recently begun having fears about her health and dying.  *Id.*  Plaintiff indicated that she wears glasses and relies on a cane or walking stick for balance.  *Id.*

### ii.  Work History Report

On September 12, 2015, Plaintiff completed a Work History Report.  AR at 206–19.  Plaintiff listed her prior work as an eligibility specialist, receptionist/administrative specialist, event receptionist, administrative specialist/case aid, administrative assistant, and customer service manager.  *Id.* at 206.  Plaintiff described the position of eligibility specialist to include reviewing applications and documentation for food stamps and Medicaid; interviewing clients in person and over the phone; inputting updated client information into the computer; and printing, faxing, scanning and mailing documents.  *Id.* at 208.  Plaintiff reported that the position required her to use machines, tools, or equipment, as well as technical knowledge or skills, and writing and completing reports, or performing other similar duties.  *Id.*  Plaintiff further reported that while working she walked, stood, and stooped for one (1) hour per day; reached for two (2) hours per day; and sat and wrote, typed, or handled small objects for six (6) hours per day.  *Id.*  Plaintiff also reported that she frequently lifted less than ten (10) pounds, which was also the heaviest weight she lifted.  AR at 208.

Plaintiff described the position of receptionist/administrative specialist to include greeting visitors at the lobby desk, answering the main telephone, inputting and retrieving computer documents, operating cash register, and dispatching and receiving returns of fleet vehicle keys. *Id.* at 209. Plaintiff reported that the position required her to use machines, tools, or equipment, as well as technical knowledge or skills, and writing or completing reports, or performing other similar duties. *Id.* Plaintiff further described the position as requiring her to stand for one (1) hour per day; walk for two (2) hours per day; reach for four (4) hours per day; and sit and write, type, or handle small objects for six (6) hour per day. *Id.* Plaintiff reported that she frequently lifted less than ten (10) pounds, and this was also the heaviest weight that she lifted. *Id.*

Plaintiff described her second position as a receptionist/administrative assistant as involving greeting visitors at the front desk, answering the main telephone lines and receiving animal abuse and neglect calls, inputting and retrieving computer information, receiving payments, printing documents, and balancing cash register payments. AR at 210. Plaintiff reported that the position required her to use machines, tools, or equipment, as well as technical knowledge or skills, and writing or completing reports, or performing other similar duties. *Id.* Plaintiff further reported that she walked and stood for thirty (30) minutes per day; reached for two (2) hours per day; and sat and wrote, typed, or handled small objects for six (6) hours per day. *Id.* Plaintiff further reported frequently lifting less than ten (10) pounds, with this also being the heaviest weight that she lifted. *Id.*

Plaintiff described her position as an event receptionist as greeting visitors, answering the telephone, receiving and logging lost and found items, receiving payments and providing receipts, and running computer reports. *Id.* at 211. Plaintiff reported walking and standing for thirty (30) minutes per day; reaching and writing, typing, or handling small objects for two (2) hours per day; and sitting for six (6) hours per day. AR at 211. Plaintiff noted that she frequently lifted less than ten (10) pounds, and that this was also the heaviest weight that she lifted. *Id.*

Plaintiff described her position as an administrative specialist and case aid as

including greeting clients at the front desk, answering main telephone lines, making photocopies, faxing, scanning, inputting, updating and retrieving information in computer, filing, and visiting clients in assisted living and nursing facilities. *Id.* at 212. Plaintiff reported that the position required her to use machines, tools, or equipment, as well as technical knowledge or skills, and writing or completing reports, or performing other similar duties. *Id.* Plaintiff reported standing and stooping for one (1) hour per day, walking and reaching for two (2) hours per day, and sitting, and writing, typing, or handling small objects for six (6) hours per day. *Id.* Plaintiff further indicated that she frequently lifted less than ten (10) pounds, and this was also the heaviest weight she lifted. AR at 212.

Plaintiff described the position of administrative assistant to include answering department telephone calls and assisting clients, creating documents and inputting information into the computer, scanning, faxing, and mailing documents, making photocopies, and providing clerical support for three (3) sales managers. *Id.* at 213. Plaintiff reported that the position required her to use machines, tools, or equipment, as well as technical knowledge or skills, and writing or completing reports, or performing other similar duties. *Id.* Plaintiff further described the position as requiring her to walk and stand for one (1) hour per day; reach for two (2) hours per day; and sit and write, type, or handle small objects for six (6) hour per day. *Id.* Plaintiff reported that she frequently lifted less than ten (10) pounds, and this was also the heaviest weight that she lifted. *Id.*

Plaintiff described her position as a customer service manager as involving scheduling and managing three (3) customer service representatives, answering telephone calls, taking event show orders, inputting orders into the computer, processing payments, photocopying, faxing, and scanning documents, and resolving billing issues. AR at 214. Plaintiff reported that the position required her to use machines, tools, or equipment, as well as technical knowledge or skills, and writing or completing reports, or performing other similar duties. *Id.* Plaintiff further reported that she walked, stood, and stooped for one (1) hour per day; and sat, reached, and wrote, typed, or handled small objects for six

(6) hours per day. *Id.* Plaintiff further reported frequently lifting less than ten (10) pounds, with twenty (20) pounds being the heaviest weight that she lifted. *Id.* Plaintiff indicated that she spent approximately ten (10) percent of her time supervising three (3) people and was a lead worker. *Id.*

Plaintiff described her second position as an administrative assistant as involving providing clerical support to department staff, answering telephones, taking messages and assisting clients, scheduling staff meetings and maintaining calendars, photocopying and distributing event documents to staff, managing part-time event receptionists, and providing back up to the receptionist. AR at 215. Plaintiff reported that the position required her to use machines, tools, or equipment, as well as technical knowledge or skills, and writing or completing reports, or performing other similar duties. *Id.* Plaintiff further reported that she walked, stood, and stooped for one (1) hour per day; and sat, reached and wrote, typed, or handled small objects for six (6) hours per day. *Id.* Plaintiff further reported frequently lifting less than ten (10) pounds, with twenty (20) pounds being the heaviest weight that she lifted. *Id.* Plaintiff also indicated that she supervised five (5) people, but did not hire or fire and was not a lead worker. *Id.*

## 2. <u>Vocational Expert Patricia Ayerza's Testimony</u>

Ms. Patricia Ayerza testified as a vocational expert at the administrative hearing. AR at 25, 61–69. The ALJ asked Ms. Ayerza to identify the specific region of the country that she referenced regarding the existence and number of jobs, as well as her understanding regarding the claimant's age and educational background. *Id.* at 63. Ms. Ayerza testified that she relied on the national economy, but had local numbers if requested, and described Plaintiff as a sixty (60) year old individual with a 12th grade education. *Id.* Ms. Ayerza described Plaintiff's past work to include an eligibility worker, Dictionary of Occupational Titles ("DOT") number 195.267-010, with a Specific Vocational Preparation ("SVP") of 6, skilled, and sedentary exertional level. *Id.* 63–64. Ms. Ayerza further described Plaintiff's past work to include receptionist, DOT number 237.367-038, with an SVP of 4, semi-skilled, and sedentary exertional level, but as

described by Plaintiff at a light exertional level, and administrative assistant, DOT number 219.362-010, with an SVP of 4, and light exertional level. *Id.* at 64–66. Ms. Ayerza also described Plaintiff's past position as a customer service manager, DOT number 241.137-014, with an SVP of 6, skilled, and sedentary exertional level, but as described by Plaintiff performed in the light range. AR at 66. Ms. Ayerza also indicated that based upon Plaintiff's educational background, she would not meet the SVP 6 for eligibility worker or customer service manager. *Id.*

The ALJ asked Ms. Ayerza to consider a hypothetical individual, the same age as Plaintiff, with the same education and work experience as Plaintiff. *Id.* at 66–67. The ALJ described the individual to be limited to sedentary work, but who is further limited to no more than occasional stooping, crouching, crawling, or kneeling, and who would need to avoid climbing ropes, ladders, or scaffolds, as well as concentrated exposure to unprotected heights, moving machinery, and hazards. *Id.* Ms. Ayerza testified that Plaintiff would be able to perform her past relevant work of receptionist, where performed in the sedentary range, but not her positions as an administrative assistant or clerk. *Id.* at 67. The ALJ also inquired regarding the customary tolerances of an employer regarding an employee who is late to work or who has unexcused or unscheduled absences. AR at 67. Ms. Ayerza testified that based on her experience and research, a person who regularly and unscheduled misses six (6) hours per day, including full days, coming in substantially late or leaving substantially early, over a monthly basis would not be competitive. *Id.* The ALJ further inquired regarding an employer's customary tolerances for an employee to be off task during the workday. *Id.* at 67–68. Ms. Ayerza testified that in her opinion, an individual who was not competing at the 80th percentile of production when compared to a normal, average worker, that person would not be competitive. *Id.* at 68. Ms. Ayerza further testified that her testimony was consistent with the information in the DOT. *Id.*

### 3. Lay Witness Testimony—William Mayhew

#### a. Function Report—Adult—Third Party

On September 13, 2015, Plaintiff's husband William Mayhew completed a Function

Report—Adult—Third Party.  AR at 220–27.  Mr. Mayhew reported that they lived together in a house.  *Id.* at 220.  Mr. Mayhew described Plaintiff as having severe knee pain in both of her knees, and her inability to ambulate resulted in her not working.  *Id.* at 220.  Mr. Mayhew noted that the constant pain also caused an increase in Plaintiff's anxiety issues and that she is unable to mentally focus for long.  *Id.*  Mr. Mayhew described Plaintiff's typical day to include stretching, sitting and using the computer, eating, watching television, bathing and dressing, sitting in the sunshine, light cleaning if she feels up to it, resting, eating dinner, watching more television, and going to bed.  *Id.* at 221.  Mr. Mayhew further reported that Plaintiff had difficulty sleeping due to pain and insomnia, but did not have any difficulty with her personal care.  AR at 221–22.  Mr. Mayhew also reported that Plaintiff cared for their dogs by letting them outside and filling their food and water bowls.  *Id.* at 221.

Mr. Mayhew indicated that Plaintiff only prepares "simple, easy food" but used to cook more complicated meals prior to the onset of her pain.  *Id.* at 222.  Mr. Mayhew reported that Plaintiff is able to do the laundry, use the dishwasher, make their bed, dust, and water outdoor plants.  *Id.*  Mr. Mayhew further reported that he takes care of any heavier indoor chores, and that other than watering plants, Plaintiff does not do any yard work.  *Id.*  Mr. Mayhew also reported that Plaintiff went outside daily and drove to the store approximately twice per week, shopping for food, gifts, and household supplies.  AR at 222–23.  Mr. Mayhew indicated that Plaintiff is able to drive and ride in a car, as well as go out alone although pain and mobility are limiting.  *Id.* at 223.  Mr. Mayhew also noted that Plaintiff is able to handle money, although she occasionally forgets having paid a bill or fails to enter an amount into their checkbook register.  *Id.*  Mr. Mayhew listed Plaintiff's hobbies and interests as including watching television, talking to family and friends, being on the computer, e-mailing, browsing Facebook, researching, reading, cooking swimming, and exercise.  *Id.* at 224.  Mr. Mayhew further noted that Plaintiff's cooking and exercise are very limited, and with all of her interests, especially travel, cooking, and socializing, Plaintiff does not derive the enjoyment that she once did.  *Id.*  Mr. Mayhew noted that most

of Plaintiff's socialization takes place on the computer, via text message, or on the telephone which she does daily; however, she does not go out regularly for socialization. AR at 224.

Mr. Mayhew observed that prior to her conditions Plaintiff was very social and upbeat, but since her pain increased and mobility decreased, she has become more negative and generally less tolerant and patient.  *Id.*  Mr. Mayhew noted that Plaintiff's conditions affect her ability to lift, squat, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, and get along with others.  *Id.* at 225.  Mr. Mayhew reiterated that Plaintiff's knee pain has caused a decrease in her mobility, as well as a reduction in her cognitive functioning due to pain and medication. *Id.*  Mr. Mayhew estimated that Plaintiff could walk four (4) blocks on a good day and one (1) block on a bad day before needing to rest for five (5) minutes.  *Id.*  Mr. Mayhew also indicated that Plaintiff could pay attention for between five (5) and ten (10) minutes, and noted that her focus and concentration are poor.  AR at 225.

Mr. Mayhew described Plaintiff as having respect for authority figures, but does not get along with controlling female bosses.  *Id.*  Mr. Mayhew observed that Plaintiff is unable to handle anything stressful or changes in routine.  *Id.* at 226.  Mr. Mayhew also noted that Plaintiff has anxiety issues, as well as a fear of aging and an inability to make decisions. *Id.*  Mr. Mayhew reported that Plaintiff wears glasses and uses a cane or walking stick.  *Id.*

### b.  Letter

On September 11, 2017, Plaintiff's husband William Mayhew wrote a letter regarding Plaintiff's health.  AR at 267.  Mr. Mayhew reported "[t]he degradation in [Plaintiff's] right knee since 2015 really has impacted her where she is unable to walk more than about 2 blocks total or stand in place for more than 2 minutes before her right knee locks up and she can't move at all for a few minutes."  *Id.*  Mr. Mayhew attributed Plaintiff's inability to work to the chronic pain and inflammation in her knees.  *Id.*  Mr. Mayhew also observed that Plaintiff has suffered increased depression and anxiety as a result of her chronic pain.  *Id.*  Mr. Mayhew reported that she angers easily and "no longer

has any interest in doing thing that brought her so much joy like spending time with family and friends, traveling, [and] cooking." *Id.* Mr. Mayhew further reported that Plaintiff does not sleep well due to the pain, and as a result has chronic fatigue and her memory and concentration are poor. AR at 267. Mr. Mayhew also reported that Plaintiff cannot drive more than fifteen (15) to twenty (20) minutes, and observed that "[i]f she overdoes anything, she will end up suffering and in bed for 2 or 3 days." *Id.*

### 4. Plaintiff's Medical Records

#### a. Treatment records[3]

On March 4, 2008, Plaintiff was seen by Carolyn J. McCarton, D.C. due to "constant neck and upper back pain that radiates down into her deltoid muscle." AR at 282, 287. Dr. McCarton performed an adjustment and ultrasound with mineral ice, after which Plaintiff reported feeling better. *Id.* at 282. Plaintiff returned to Dr. McCarton through March and April 2008 regarding her neck and shoulder pain. *Id.* at 282–83, 439–40, 531–32. At each appointment Dr. McCarton performed an adjustment and ultrasound with mineral ice, after which Plaintiff reported feeling better. *Id.*

On February 2, 2010, Plaintiff returned to Dr. McCarton complaining of neck and upper back pain on her right side related to stress. *Id.* at 283, 289, 439, 531. Dr. McCarton performed an adjustment and ultrasound, after which Plaintiff reported feeling better. AR at 283, 289, 439, 531. On March 1, 2010, Plaintiff returned to Dr. McCarton for an adjustment and ultrasound, as well as a therapeutic massage, after which she reported feeling better. *Id.*

On August 6, 2012, Plaintiff had radiographs taken of her left and right knees. *Id.* at 295–96, 329–30, 433, 435, 525, 527. Regarding Plaintiff's right knee, William Colt, M.D.'s impression noted "moderate to moderately severe arthritis is most obvious in the lateral compartment." *Id.* at 295, 329, 435, 527. Dr. Colt's observed that Plaintiff's left knee had "[m]oderately severe triple compartment osteoarthritis with no acute

---

[3] The Court has reviewed the entirety of Plaintiff's medical records; however, due to Plaintiff's challenge regarding the ALJ's assessment of Dr. Weintraub's opinion, the Court has generally limited its summary to those records involving Plaintiff's physical complaints.

abnormalities." *Id.* at 296, 330, 433, 525.  Plaintiff saw Paul L. Tesar, M.D. on the same date, who noted that Plaintiff had moderate bilateral osteoarthritis, worse on the left than right.  AR at 328.  On September 17, 2012, Plaintiff saw Dr. Tesar and received a Synvisc One injection for her left knee pain.  *Id.* at 327.  On October 12, 2012, returned to Dr. McCarton complaining of neck and upper back pain on her right side, as well as left knee pain.  *Id.* at 284, 291, 438, 520–21, 530.  Dr. McCarton performed a cervical adjustment and ultrasound with mineral ice to Plaintiff's neck and left knee, after which Plaintiff reported feeling some improvement.  *Id.* at 284, 291, 438, 530.  On November 5, 2012, Plaintiff saw Dr. Tesar and reported that the Synvisc injection did not help.  *Id.* at 327.  Plaintiff further reported that she was starting work the following day and was interested in alternatives to treatment.  *Id.*  Dr. Tesar discussed the use of an unloader brace and arthroscopic surgery, and Plaintiff indicated that she would think about what treatment she would prefer.  AR at 327.

On May 13, 2013, Ira M. Weintraub, M.D. performed a total knee replacement of Plaintiff's left knee.  *Id.* at 853–55.  On the same date, Plaintiff had radiographs of her left knee following the total knee replacement.  *Id.* at 297, 434, 526.  Dr. Colt noted that the x-ray was an "[u]nremarkable post knee replacement study[.]"  *Id.*  On July 2, 2013, Skye Waggoner, PA-C prescribed physical therapy for Plaintiff.  *Id.* at 351.  On the same date, Plaintiff saw H. Patrick Corrigan, MS PT for physical therapy regarding her knee.  AR at 325.  Plaintiff sought input regarding whether "she should go back to MD to discuss scar tissue as she feels she is not bending enough."  *Id.*  Mr. Corrigan's assessment noted that Plaintiff's "[k]nee flexion ROM has increased to 110[,] [p]rogressing well."  *Id.*  On the same date, Plaintiff saw PA Waggoner who released her back to light duty work.  *Id.* at 353.  On July 8, 2013, Plaintiff saw PA Waggoner following a left total knee arthroscopy.  *Id.* at 346.  PA Waggoner noted that Plaintiff "is about three degrees shy of extension[,] [s]he reache[d] about 105 degrees of flexion."  AR at 346.  PA Waggoner's examination was otherwise unremarkable.  *Id.*  PA Waggoner further noted that Plaintiff was "doing okay[,]" and could return to work on July 15, 2013.  *Id.*  On the same date, Plaintiff returned

to Mr. Corrigan for physical therapy. *Id.* at 324. Mr. Corrigan noted a "[m]arked decrease in distal quad tension and tenderness[,] [and] [s]car mobility still decreased over patella." *Id.* On July 9, 2013, Plaintiff saw David Bogden, PT for physical therapy of her knee. AR at 323. Plaintiff did not report any new complaints and was noted to be progressing as expected. *Id.* On July 16, 2013, Plaintiff saw Mr. Corrigan for physical therapy. *Id.* at 322. Plaintiff reported that "she ha[d] a goal of getting in a kayak again." *Id.* Mr. Corrigan noted a "[m]arked decrease in distal quad tension and tenderness[,] [and] [s]car mobility still decreased over patella." *Id.* On July 19, 2013, Plaintiff saw Mr. Corrigan for physical therapy. AR at 321. Plaintiff reported "increase[d] pain this week with returning to work and progression of exercises." *Id.* Mr. Corrigan noted Plaintiff experienced "[s]light discomfort over patella with leg press[,] [and] [s]trength with U heel raise improved." *Id.* On July 24, 2013, Plaintiff saw Mr. Corrigan for physical therapy. *Id.* at 320. Plaintiff reported that "work [was] going better than last week, but still sorer than anticipated." *Id.* Mr. Corrigan noted that Plaintiff was able to complete all exercises without complaints of pain, as well as an improvement in control. *Id.* On July 26, 2013, Plaintiff saw Mr. Corrigan for physical therapy and "report[ed] she [wa]s pleased with how much better her week went this week[,] [with] [l]ess pain[,] [but] [s]till having difficulty getting up from chair/toilet." AR at 319. Mr. Corrigan noted that Plaintiff's "[m]echanics and depth of squat with kettlebell lift improving[,]" but observed that her right knee might be a limiting factor. *Id.* On July 30, 2013, Plaintiff saw Barry A. Jacoshenk, PA-C, who worked with her range of motion, provided a home exercise program, and returned Plaintiff to light duty work three (3) days per week. *Id.* at 350, 352. On July 31, 2013, Plaintiff saw Mr. Corrigan for physical therapy. *Id.* at 318. Plaintiff reported "shooting electrical pain in lateral knee to top of foot." *Id.* Mr. Corrigan was "[a]ble to reproduce [symptoms] with palpation in anterior tib region and with [n]eural glides for sural and peroneal nerve bias." AR at 318.

On August 2, 2013, Plaintiff returned to Mr. Corrigan for physical therapy. *Id.* at 317. Plaintiff reported that she had not had any "shooting electrical pains in anterior tib to dorsum of foot since last visit." *Id.* Mr. Corrigan noted that Plaintiff's strength was

improving and that she "[t]olerated progression of weight/reps without difficulty." *Id.* On August 5, 2013, Plaintiff saw Mr. Corrigan for physical therapy and reported that she had not had any more shooting electrical pains. *Id.* at 316. Treatment was unremarkable. AR at 316. On August 14, 2013, Plaintiff returned to Mr. Corrigan for physical therapy. *Id.* at 314–15. Plaintiff reported that she had "turned a corner[,]" did not require pain pills the previous week, and was pleased with her progress. *Id.* at 314. Mr. Corrigan noted that all goals had been met and recommended Plaintiff's discharge with a continuation of her home exercise program. *Id.* at 314–15.

On October 28, 2013, Plaintiff saw PA Jacoshenk for a recheck of her left total knee. *Id.* at 345. PA Jacoshenk observed that Plaintiff seemed to have "ha[d] a bit of a misunderstanding of how long the [recovery] process takes, and upon this conversation, she ha[d] the idea that she would be further along than she [was]." AR at 345. PA Jacoshenk's physical examination showed Plaintiff's range of motion was zero (0) to approximately 110 degrees and was otherwise unremarkable. *Id.* PA Jacoshenk further noted that Plaintiff was not using a cane, and recommended that she continue with physical therapy. *Id.*

On December 20, 2013, Plaintiff returned to Dr. Weintraub for a check-up "about seven months post total knee." *Id.* at 344. Dr. Weintraub noted that Plaintiff was "doing well . . . [with] very minimal complaints about her knee." *Id.* Dr. Weintraub further noted that Plaintiff was "getting around well[,] . . . moving easily[,] [and] . . . sa[id] it seems to be getting better all the time." AR at 344. Dr. Weintraub's physical examination was unremarkable, and he recommended that Plaintiff "keep working hard on her strengthening, exercises[,]" and observed that "[t]here [wa]s no reason she should stop exercising." *Id.*

On April 4, 2014, Plaintiff saw Dr. Phelps and indicated that she was "planning to return to Ortho . . . to discuss further mgmt [of her knee pain]" and that she was "well managed with ibuprofen." *Id.* at 376. Plaintiff further reported that she was not currently interested in a right knee replacement. *Id.* at 377. On April 14, 2014, Plaintiff was seen

by Dr. McCarton regarding her left knee pain after a replacement.  *Id.* at 284, 293, 438, 530.  Dr. McCarton performed an ultrasound with mineral ice, and Plaintiff reported feeling better.  AR at 284, 293, 438, 530.  On April 17, 2014, Plaintiff returned to Dr. McCarton regarding her left knee pain, as well as right knee pain.  *Id.*  Dr. McCarton performed an ultrasound with mineral ice, and Plaintiff reported feeling better.  *Id.*  On April 22, 2014, Plaintiff returned to Dr. McCarton and reported that her knees were feeling better.  *Id.*  Plaintiff further reported that she had gone for a walk during a break and remained pain free.  *Id.*  Dr. McCarton performed an ultrasound with mineral ice to both knees, and Plaintiff reported feeling better.  AR at 284, 293, 438, 530.  On April 24, 2014, Plaintiff returned to Dr. McCarton and reported that her knees felt better, though had "twinges" of pain.  *Id.* at 285, 437, 529.  Dr. McCarton noted there was no edema around Plaintiff's left patella and performed an ultrasound with mineral ice.  *Id.*

On May 22, 2014, Plaintiff saw Ira M. Weintraub, M.D. for "a one year check on her left total knee."  *Id.* at 343.  Plaintiff reported pain and some numbness, but that she was doing most of her activities.  *Id.*  Dr. Weintraub's examination showed a good range of motion.  AR at 343.  Dr. Weintraub's assessment noted that Plaintiff's right knee would require replacement at some point, and recommended that she keep doing her strengthening exercises.  *Id.* at 343, 349.  On June 10, 2014, Plaintiff was seen by Christine Jowaiszas, PT, DPT, complaining of bilateral knee pain.  *Id.* at 312–13.  Ms. Jowaiszas noted Plaintiff had "significant B[ilateral] hip and knee weakness[,]" and that she would benefit from therapy to increase strength and tolerance, and decrease pain.  *Id.* at 313.  On June 11, 2014, Plaintiff returned to Ms. Jowaiszas and reported that her right knee was causing pain and had started to lock up.  *Id.* at 311.  On June 12, 2014, Plaintiff saw Ms. Jowaiszas and reported that "her knees feel 'ok' but [wa]s feeling generally fatigued[.]"  AR at 310.  Plaintiff's physical therapy was unremarkable.  *Id.*  On June 17, 2014, Plaintiff saw Ms. Jowaiszas and did not have any new complaints.  *Id.* at 309.  Ms. Jowaiszas noted that Plaintiff had difficulty with backwards return on reciprocal set up and overs.  *Id.*  On June 24, 2019, Plaintiff saw Ms. Jowaiszas and reported that she was "sore today after wearing

heels yesterday." *Id.* at 308.  Ms. Jowaiszas noted that Plaintiff had increased knee symptoms during therapy.  AR at 308.  On June 26, 2014, Plaintiff saw Ms. Jowaiszas and reported she had leg cramps the previous night.  *Id.* at 307.  Plaintiff's physical therapy was unremarkable.  *Id.*  On June 30, 2014, Plaintiff saw Ms. Jowaiszas, without new symptoms or cramping since her last visit.  *Id.* at 306.  Ms. Jowaiszas noted that Plaintiff was "able to tolerate increased cumulative time on cardio equipment today."  *Id.*

On July 2, 2014, Plaintiff saw Ms. Jowaiszas and reported that she "tolerated last treatment well[,]" but had "a couple episodes of L[eft] knee hyperextension in the past couple weeks."  AR at 305.  Plaintiff's physical therapy session was unremarkable.  *Id.*  On July 8, 2014, Plaintiff saw Ms. Jowaiszas, and had an unremarkable physical therapy session.  *Id.* at 304.  On July 10, 2014, Plaintiff saw Ms. Jowaiszas and did not have any new complaints.  *Id.* at 303.  Plaintiff's physical therapy was unremarkable.  *Id.*  On July 15, 2014, Plaintiff saw Ms. Jowaiszas and did not have any new complaints.  AR at 302. Plaintiff reported that she was able to do water aerobics for an hour without problems.  *Id.* Plaintiff's physical therapy was unremarkable.  *Id.*  On July 22, 2014, Plaintiff saw Ms. Jowaiszas for physical therapy and reported that she was doing water aerobics and swimming laps more frequently.  *Id.* at 301.  Plaintiff's physical therapy was unremarkable. *Id.*  On July 23, 2014, Plaintiff saw Ms. Jowaiszas and reported feeling stronger, and that she was swimming laps and doing water aerobics.  AR at 299–300.  Ms. Jowaiszas noted that Plaintiff had met her goals and returned to her previous functional level.  *Id.* at 299. On July 29, 2014, Plaintiff saw Ms. Jowaiszas and did not report any problems with her knees.  *Id.* at 298.  Ms. Jowaiszas recommended Plaintiff be discharged from physical therapy and continue with her home exercise program.  *Id.*  On August 7, 2014, Plaintiff returned to Dr. McCarton, "complain[ing] of pain between her shoulders on the right."  *Id.* at 285, 437, 529.  Dr. McCarton performed an adjustment and ultrasound with mineral ice, as well as showed Plaintiff exercises for home.  AR at 285, 437, 529.

On January 5, 2015, Plaintiff saw Pamela Pastore, FNP regarding right knee pain. *Id.* at 368–69.  Plaintiff reported that she "was swimming laps 3 days ago and feels she

twisted her knee." *Id.* at 368.  Plaintiff further reported having "more pain, especially with walking" since then.  *Id.*  NP Pastore's physical examination was unremarkable.  *Id.* at 369. On the same date, Plaintiff had radiographs of her right knee taken.  AR at 326, 387.  Kari Thomas, M.D. noted a "[p]rogression of tricompartmental right knee degenerative joint disease, most pronounced in the lateral compartment."  *Id.*  NP Pastore reported to Plaintiff that her arthritis had worsened.  *Id.* at 369.  On January 8, 2015, Plaintiff saw PA Jacoshenk for a recheck of her right knee.  *Id.* at 342.  Plaintiff complained of increased issues with her right knee, but "really want[ed] to avoid any type of surgical intervention for her right knee as she [] had a less than optimal outcome with her left knee in May 2013."  *Id.*  PA Jacoshenk's impression noted "[s]evere degenerative arthritis lateral compartment of the right knee with global moderate severe degenerative changes."  AR at 342.  PA Jacoshenk injected Plaintiff's right knee with cortisone without complication.  *Id.*

On April 20, 2015, Plaintiff returned to Dr. McCarton regarding her bilateral knee pain.  *Id.* at 285, 437, 529.  Dr. McCarton performed an ultrasound with Biofreeze and Plaintiff also received a therapeutic massage.  *Id.*  On April 23, 2015, Plaintiff returned to Dr. McCarton complaining of bilateral knee pain, but reporting that after her last treatment she could walk longer distances.  *Id.* at 285, 437, 529.  Dr. McCarton performed an ultrasound with Biofreeze, and Plaintiff reported feeling better.  AR at 285, 437, 529.  On April 24, 2015, Plaintiff was seen at Longview Orthopedic Associates for a second opinion on her right knee.  *Id.* at 338–40, 412–14.  Plaintiff reported "right knee pain of 5-10 years' duration that has gotten significantly more severe in the last three weeks."  *Id.* at 338, 412. Plaintiff further reported that "[t]he pain is constant and is worsened with any type of weightbearing activity."  *Id.*  Christine L. Matthews, PA-C noted that Plaintiff acknowledged that she was "heavy and need[ed] to lose weight but she cannot do it because she can't exercise."  *Id.*  Plaintiff sought options "for her right knee short of doing a total joint replacement."  AR at 338, 412.  PA Matthews assessed severe degenerative joint disease tricompartmentally of the right knee with the lateral compartment being bone on bone.  AR at 339, 413.  PA Mathews noted that Plaintiff required an aggressive weight loss

program with low impact exercise and possibly an off loading knee brace.  *Id.* at 340, 414. On April 27, 2015, Plaintiff returned to Dr. McCarton and reported that "x-rays of her right knee . . . [showed] bone on bone and some spurs."  *Id.* at 286, 441, 533 (quotations omitted). Plaintiff further reported that her PCP was going to do injections.  *Id.*  Dr. McCarton performed an ultrasound with Biofreeze to both knees.  AR at 286, 441, 533.  On April 30, 2015, Plaintiff saw Dr. McCarton regarding neck and upper back pain, with a headache. *Id.* at 286, 441, 533.  Plaintiff reported that her knees felt better, but that she had neck and upper back pain.  *Id.* at 286, 441, 533.  Dr. McCarton performed thoracic adjustments and ultrasounds with Biofreeze to her neck, upper back, and both knees.  *Id.*

On May 29, 2015, Plaintiff saw David Maligro, PA-C at Longview orthopedic Associates for a Euflexxa injection in her right knee.  *Id.* at 336–37, 410–11.  The injection procedure was unremarkable.  AR at 336–37, 410–11.  On June 5, 2015, Plaintiff returned to Longview Orthopedic Associates.  *Id.* at 334–35, 408–09.  PA Matthews gave Plaintiff a second Euflexxa injection and noted that Plaintiff "ha[d] not noticed much in a way of help [from the previous injection] at this time."  *Id.* at 334, 408.  The injection procedure was unremarkable.  *Id.* at 334–35, 408–09.  On June 12, 2015, Plaintiff saw PA Matthews for a third Euflexxa injection.  *Id.* at 332–33, 406–07.  The injection procedure was unremarkable.  AR at 332–33, 406–07.

On July 30, 2015, Plaintiff saw PA Jacoshenk requesting a corticosteroid injection to her right knee.  *Id.* at 341, 357, 417.  Plaintiff reported that her previous injection "only helped minimally[,]" and "[s]he received a 2nd opinion and was told that she was not old enough to receive a replacement."  *Id.*  PA Jacoshenk gave Plaintiff a corticosteroid injection and discussed her need for a total knee replacement."  *Id.*  PA Jacoshenk also informed Plaintiff "that her experience with her left knee is uncommon and [he] would not expect her to have similar results on the right knee."  *Id.*  On the same date, Plaintiff was seen by Janett Phelps, DO for a well adult check-up.  AR at 363–66.  Plaintiff complained of "a great deal of knee pain[,]" but examination was otherwise unremarkable.  *Id.* at 365–66.

On October 15, 2015, Ira M. Weintraub, M.D. filled out a Medical Information Statement on behalf of Plaintiff.  *Id.* at 356, 416, 475.  Dr. Weintraub opined that Plaintiff became totally disabled on July 15, 2015 due to "[s]evere bilateral degenerative arthritis, knees."  *Id.*  Dr. Weintraub noted that Plaintiff was "unable to stand or walk without locking of right knee, unable to walk long distances due to bilateral knee pain, unable to walk approx. 4 minutes without pain."  *Id.*  On November 12, 2015, Plaintiff saw Dr. Phelps, for a check-up.  AR at 480–81.  Dr. Phelps noted that Plaintiff had discussed surgery with Dr. Weintraub, but Plaintiff "want[ed] to hold off on surgery until last resort."  *Id.* at 480.  On the same date, Dr. Phelps completed a Medical Information Statement for Plaintiff.  *Id.* at 358.  Dr. Phelps opined that Plaintiff was first totally disabled on July 15, 2015 due to osteoarthritis of both knee joints.  *Id.*  Dr. Phelps noted Plaintiff's conditions "result[] in pain which decreases ambulation, esp. long distances, standing long periods."  *Id.*

On January 19, 2016, Plaintiff established care at Stano Chiropractic.  AR at 442–43, 534–35, 543–46.  Plaintiff reported osteoarthritis in her knees and shoulders, with frequent, sharp or stabbing pain that was made worse by lying down, standing, walking, sitting, exercise, and inactivity or resting.  *Id.* at 442, 448, 534.  Plaintiff further reported that nothing reduced her pain.  *Id.* at 442, 448, 534.  Deborah Stano, DC manipulated Plaintiff's spine and performed myofascial release on her right shoulder.  *Id.* at 451, 546. Dr. Stano also referred Plaintiff for therapeutic massage.  *Id.*  On January 21, 2016, Plaintiff returned to Dr. Stano reporting mild improvement in her neck and back pain with a slight increase in her range of motion.  AR at 452–54, 547–49.  Dr. Stano manipulated Plaintiff's spine, and Plaintiff received massage therapy.  *Id.* at 452–53, 547.  On January 26, 2016, Plaintiff saw Dr. Stano for ultrasound on her left knee, as well as therapeutic massage.  *Id.* at 455–57, 550–52.  On January 28, 2016, Plaintiff saw Dr. Stano for spinal manipulation and therapeutic massage.  *Id.* at 458–59, 553–54.  Plaintiff reported continued mild improvement.  *Id.* at 458, 553.

On February 9, 2016, Plaintiff returned to Dr. Stano for spinal manipulation and massage.  AR at 461–62, 555–57.  On February 11, 2016, Plaintiff received a therapeutic

massage at Stano Chiropractic.  *Id.* at 463, 558–59.  On February 16, 2016, Plaintiff returned to Stano Chiropractic for another therapeutic massage.  *Id.* at 464–65, 560–61. Plaintiff reported a continued decrease in pain.  *Id.* at 465, 561.  On February 18, 2016, Plaintiff received a therapeutic massage at Stano Chiropractic.  *Id.* at 466–67, 562–63.  On February 23, 2016, Plaintiff again received a therapeutic massage at Stano Chiropractic. AR at 468–69, 564–65.  On February 25, 2016, Plaintiff received therapeutic massage at Stano Chiropractic.  *Id.* at 470–71, 566–67.  On March 1, 2016, Plaintiff returned to Dr. Weintraub for a check-up.  *Id.* at 473–74, 652.  Dr. Weintraub noted that Plaintiff's "[l]eft knee is doing well[,] [and] [her] [r]ight knee is becoming more and more painful."  *Id.* at 473, 652.  Plaintiff received a steroid injection.  *Id.*  Throughout March 2016, Plaintiff received massage therapy at Stano Chiropractic.  AR at 569–86.  During this time Plaintiff reported ongoing reductions in her pain levels.  *Id.* at 576, 577, 580–81, 583–84, 586.

On June 7, 2016, Plaintiff returned to Stano Chiropractic for therapeutic massage. *Id.* at 587–89.  Plaintiff reported that "she ha[d] been at her vacation home in Arizona for the past few months and ha[d] been working around their house."  *Id.* at 587.  On June 9, 2016, Plaintiff reported feeling "mild relief following her last visit[,]" and received a therapeutic massage.  *Id.* at 591–92.  On June 20, 2016, Plaintiff returned to Stano Chiropractic complaining of "throbbing pain in her neck and shoulders, prominently on the [right] side[,]" and received a therapeutic massage.  AR at 590, 593.  On June 23, 2016, Plaintiff was seen at Stano Chiropractic and "report[ed] that she felt moderate relief following her last visit with an overall decrease in pain[.]"  *Id.* at 595.  Plaintiff received a therapeutic massage.  *Id.*  On June 28, 2016, Plaintiff again returned to Stano Chiropractic and reported having "felt moderate relief following her last visit with an overall decrease in pain."  *Id.* at 596–97.  Plaintiff received a therapeutic massage.  *Id.*  On June 30, 2016, Plaintiff received a therapeutic massage, reporting no significant changes.  AR at 598–99.

On July 5, 2016, Plaintiff returned to Stano Chiropractic and "continue[d] to report overall improvement in her back and neck pain."  *Id.* at 600–01.  Plaintiff received a therapeutic massage.  *Id.*  On July 7, 2016, Plaintiff was seen at Stano Chiropractic for a

therapeutic massage, without new or worsening symptoms. *Id.* at 602–03. On July 14, 2016, Plaintiff saw PA Jacoshenk for a recheck of her right knee. *Id.* at 651. Plaintiff reported that "she continue[d] to get moderate relief from the[] [corticosteroid] injections[,]" and was "really not ready to consider [] hav[ing] her knee replaced." *Id.* Plaintiff received a corticosteroid injection. AR at 651.

On January 5, 2017, Plaintiff was seen at Stano Chiropractic "with complaints of pain in her back, neck and shoulders as well as her knees." *Id.* at 604–08. Plaintiff reported having been in Arizona for several months and indicated that "returning to the cold weather here has set off her arthritis[.]" *Id.* at 608. Plaintiff received therapeutic massage. *Id.* Throughout January, February, March, and April 2017, Plaintiff regularly received therapeutic massage at Stano Chiropractic. *Id.* at 609–42. On January 23, 2017, Plaintiff saw PA Jacoshenk for a recheck of her right knee. AR at 649. Plaintiff sought a cortisone injection prior to going on a cruise to Central America. *Id.* PA Jacoshenk opined that Plaintiff "is nearing the end of tolerating her knee[,]" and would likely have a total knee replacement on the right side. *Id.* The cortisone injection was unremarkable. *Id.*

On February 14, 2017, Plaintiff saw Dr. Weintraub for check-up. *Id.* at 647. Plaintiff reported that her left knee is "always painful" and acknowledged that she "needs to have her right knee replaced." AR at 647. Plaintiff also reported that "[a]t her job, she has to walk, sit, get up and down frequently, etc. . . . [and] just cannot do it anymore[.]" *Id.* Dr. Weintraub noted that he did not know what was happening with Plaintiff' left knee, because physical examination of the knee did not show that it was loose or otherwise had issues. *Id.* On February 28, 2017, Plaintiff had blood flow, blood pool, and static images taken of her knees. *Id.* at 495–96, 506–07, 653–54, 685–86, 719, 734–35, 753. Andrew Cox, M.D. noted that Plaintiff's blood flow and blood pool images were unremarkable. *Id.* at 495, 506, 653, 685, 719, 734, 753. Dr. Cox also found "[m]ild uptake about a left knee prosthesis may reflect trauma, loosening or infection." AR at 495, 506, 653, 685, 719, 734, 753.

On March 7, 2017, Plaintiff returned to Dr. Weintraub for a follow-up after her bone

scan. *Id.* at 646. Plaintiff complained of continued knee pain in her knee that was replaced and expressed concern about having her other knee replaced. *Id.* Dr. Weintraub expressed doubt about her continued ability to work, but recommended that Plaintiff continue to do strengthening exercises. *Id.* On March 20, 2017, Plaintiff established care with Kathryn Baker, DO. *Id.* at 508–11, 687–90. Plaintiff complained of chronic diffuse body pain and fatigue. AR at 508, 687. Dr. Baker's physical examination was unremarkable, but her assessment suggested fibromyalgia. *Id.* at 510, 689–90. On March 23, 2017, Dr. Weintraub completed a Residual Functional Capacity Form on behalf of Plaintiff. *Id.* at 512–17, 675–680. Dr. Weintraub observed that Plaintiff had a left knee replacement in 2013, and that "she [wa]s not improving with post op care." *Id.* at 512, 675. Dr. Weintraub noted that Plaintiff had persistent pain with and without increased activity. *Id.* Dr. Weintraub further noted severe degenerative joint disease in Plaintiff's right knee and stable x-ray of left total knee. AR at 512, 675. Dr. Weintraub also noted that Plaintiff's bone scan had some increase per-prosthetic uptake, non-specific. *Id.* Dr. Weintraub diagnosed "severe degenerative arthritis of knees[,] [and] continued painful knee after left total knee." *Id.* Dr. Weintraub indicated that Plaintiff's disability onset date on July 15, 2015. *Id.* at 513, 676. Dr. Weintraub reported that Plaintiff was "[o]nly able to stand about 2 minutes before right knee locks up; knee buckles at times and she's fallen[.]" *Id.* Dr. Weintraub opined that Plaintiff was "able to sit for 30 minutes before pain and stiffness is too intense[,] [s]he needs to elevate knees and ice them, and lay down to rest every 2 hours for 30 minutes." AR at 513, 676. Dr. Weintraub further opined that Plaintiff's inability to stand for long periods was chronic pain, stiffness, and inflammation from osteoarthritis in her knees. *Id.* at 514, 677. Dr. Weintraub also opined that Plaintiff had difficulty sleeping without pain, causing extreme fatigue, required "bed rest or elevate and ice knees for 30 minutes every 2 hours[,]" and could "only walk less than one block without stopping due to pain." *Id.* Dr. Weintraub opined that Plaintiff could frequently reach down to waist level, and rarely reach up above her shoulders, reach down towards the floor, carefully handle objects, and handle with fingers. *Id.* Dr. Weintraub further opined that Plaintiff

could lift and carry less than five (5) pounds during an eight (8) hour period and regularly carry less than five (5) pounds. *Id.* Dr. Weintraub indicated that Plaintiff would have difficulty bending, squatting, and kneeling. *Id.* at 515, 678. Dr. Weintraub noted that Plaintiff could drive alone for close trips of fifteen (15) to thirty (30) minutes, but was unable to function on pain medication. AR at 515, 678. Dr. Weintraub described Plaintiff's bilateral knee pain from osteoarthritis as chronic and at a level 7 or 8 most of the time. *Id.* Dr. Weintraub found Plaintiff to be "totally credible." *Id.* at 516, 679.

On August 10, 2017, Dr. Weintraub completed a Residual Physical Functional Capacity Assessment for Plaintiff. *Id.* at 644–45. Dr. Weintraub opined that Plaintiff could occasionally lift less than ten (10) pounds, but could not carry any weight frequently. *Id.* at 644. Dr. Weintraub further opined could stand and/or walk for five (5) to ten (10) minutes at a time, and for less than two (2) hours in an eight (8) hour workday. AR at 644. Dr. Weintraub also opined that Plaintiff could sit for one (1) to two (2) hours at a time, and between two (2) to four (4) hours in an eight (8) hour day. *Id.* Dr. Weintraub opined that Plaintiff's ability to push and/or pull was limited in her lower extremities, and she should never climb, balance, stoop, bend, kneel, crouch, crawl, reach overhead, reach at shoulder height, handle, finger, or feel. *Id.* Dr. Weintraub noted shoulder pain as the reason for the upper extremity limitations. *Id.* Dr. Weintraub further noted that Plaintiff appeared unable to handle stress and would be expected to miss two (2) or more days of work per month. *Id.* at 645. On August 31, 2017, Plaintiff saw Dr. Phelps regarding pain. AR at 709–12. Plaintiff indicated that she was "reluctant about replacement in [right] knee b[ecause] she d[id] not feel [left] knee is optimal." *Id.* at 711. Dr. Phelps's physical examination of Plaintiff was unremarkable. *Id.* at 712.

On September 8, 2017, Plaintiff saw Joseph P. Schenck, M.D. regarding her right hip and shoulder pain. *Id.* at 874–75. Dr. Schenck's physical examination of Plaintiff was unremarkable. *Id.* Dr. Schenck observed that Plaintiff had "see[n] a colleague and friend of mine in Tucson, Arizona, Dr. Michael Miller, who could not find anything wrong with the left knee." AR at 874. Dr. Schenck noted that Plaintiff's radiographs indicated "some

degenerative scoliosis appearing at the thoracolumbar and upper lumbar spine.  *Id.*  On September 18, 2017, Plaintiff underwent magnetic resonance imaging ("MRI") of her lumbar spine due to low back pain, right hip, and groin pain.  *Id.* at 869–70, 872–73. Plaintiff's scans showed multilevel degenerative disk disease and facet arthropathy.  *Id.* Dr. Schenck noted that Plaintiff's MRI "show[ed] significant stenosis at L3-L4 with some right-sided foraminal stenosis as well."  *Id.* at 871.

### b.  Examining physician

On November 11, 2015, Plaintiff saw Gary Sacks, Ph.D. for a psychodiagnostics examination.  AR at 421–25.  Dr. Sacks reviewed two records from Legacy Emanuel Medical Center and performed a diagnostic interview and mental status examination.  *Id.* at 421.  Dr. Sacks indicated that "[t]he following information was obtained from Ms. Mayhew without corroboration, and opinions formed as a result of this consultation should be viewed in that light."  *Id.*  Dr. Sacks's mental status examination of Plaintiff was unremarkable.  *Id.* at 422.  Plaintiff reported that did not do as many household chores as she had previously, but was able to do laundry and dishes.  *Id.* at 423.  Plaintiff further reported that she had "g[i]ve[n] up swimming for exercise some time ago because of knee pain."  AR at 423.  She also reported that she gave up walking her dogs, but enjoyed water aerobics.  *Id.*  Dr. Sacks's impression included persistent depressive disorder, and he opined that Plaintiff "appear[ed] capable of handling benefit funds independently, if granted."  *Id.* at 424.

### c.  Reviewing physicians

#### i.  *Neal E. Berner, M.D.*

On December 4, 2015, Neal E. Berner, M.D. reviewed Plaintiff's medical records for the initial determination and provided a physical residual functional capacity assessment.  AR at 81–84.  Dr. Berner opined that Plaintiff could occasionally lift twenty (20) pounds and frequently lift ten (10) pounds.  *Id.* at 81.  Dr. Berner further opined that Plaintiff could stand and/or walk for a total of two (2) hours; sit for approximately six (6) hours in an eight (8) hour workday; and that she was unlimited in her ability to push and

1   pull.  *Id.*  Dr. Berner also opined that Plaintiff should never climb ladders, ropes, or

2   scaffolds; that she could occasionally stoop, kneel, crouch, and crawl; and was unlimited

3   in her ability to climb ramps and stairs or balance.  *Id.* at 81–82.  Dr. Berner did not find

4   any manipulative, visual, communicative, or environmental limitations.  *Id.* at 82.  Dr.

5   Berner concluded that Plaintiff's activities of daily living supported a sedentary residual

6   functional capacity with postural limits.  AR at 82.

### ii.   Peter A. Bernardo, M.D.

8   On March 30, 2016, Peter Bernardo, M.D. reviewed Plaintiff's medical records for

9   a determination on reconsideration and provided a physical residual functional capacity

10  assessment.  AR at 96–99, 101.  Dr. Bernardo opined that Plaintiff could occasionally lift

11  or carry twenty (20) pounds, and frequently lift or carry ten (10) pounds.  *Id.* at 96.  Dr.

12  Bernardo further opined that Plaintiff could stand or walk for two (2) hours; sit for

13  approximately six (6) hours in an eight (8) hour workday; and that she is unlimited in her

14  ability to push or pull.  *Id.*  Dr. Bernardo also opined that Plaintiff should never climb

15  ladders, ropes, or scaffolds; that she could occasionally stoop, kneel, and crouch; and that

16  she was unlimited in her ability to climb ramps or stairs and balance.  *Id.* at 96–97.  Dr.

17  Bernardo did not place any manipulative, visual, communicative, or environmental

18  limitations on Plaintiff.  *Id.* at 97.  Dr. Bernardo concluded that Plaintiff did not make any

19  allegations of worsening at reconsideration.  AR at 97.

20

## II.   STANDARD OF REVIEW

22  The factual findings of the Commissioner shall be conclusive so long as they are

23  based upon substantial evidence and there is no legal error.  42 U.S.C. §§ 405(g),

24  1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).  This Court may

25  "set aside the Commissioner's denial of disability insurance benefits when the ALJ's

26  findings are based on legal error or are not supported by substantial evidence in the record

27  as a whole."  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see*

28  *also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'"  *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

## III.  ANALYSIS

### A.  *The Five-Step Evaluation*

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows:  Step one asks is the claimant "doing substantial gainful activity[?]"  If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]"  If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work.  If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience. If it is determined that the claimant can make an adjust6ment to other work, then he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff had "not engaged in substantial

gainful activity since July 14, 2015, the amended alleged onset date (20 CFR 404.1571 *et seq.*)."  AR at 27.  At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: obesity, lumbar degenerative disc disease, osteoarthritis of the right knee, and status post total knee arthroplasty of the left knee (20 CFR 404.1520(c))."  *Id.*  The ALJ further found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526)."  *Id.* at 30.  Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she is further limited to no more than occasional stooping, crouching, crawling, or kneeling[,] [and] . . . would need to avoid climbing ropes, ladders or scaffolds, and would need to avoid concentrated exposure to unprotected heights, moving machinery and similar hazards."  *Id.* at 30.  At step four, the ALJ found that "[t]he claimant is capable of performing past relevant work as a receptionist."  AR at 36.  Accordingly, the ALJ determined that Plaintiff was not disabled.  *Id.* at 37.

Plaintiff asserts that the ALJ committed error by giving inappropriate weight to the examining source opinion of Dr. Weintraub.  *See* Opening Br. (Doc. 14).  Plaintiff further asserts that the ALJ erred in failing to properly "tie-in the characterization of the medical record with any particular symptom testimony."  *Id*. at 19 (citations omitted).

### B.      Treating Physician Testimony

Plaintiff asserts that "the ALJ relied upon a manufactured conflict, because there [wa]s no inconsistency between Dr. Schenck's findings or treatment recommendations and Dr. Weintraub's assessment of limitations related to degenerative knee arthritis."  Pl's Opening Br. (Doc. 14) at 12 (citations omitted).  Plaintiff further argues that "the ALJ was not qualified, as an administrative adjudicator, to provide an independent analysis of medical evidence, that is, decide on his own that the record contained findings that would justify rejection of the treating physician's opinion."  *Id.* at 13 (citations omitted).

1      "As a general rule, more weight should be given to the opinion of a treating source

2  than to the opinion of doctors who do not treat the claimant."  *Lester v. Chater*, 81 F.3d

3  821, 830 (9th Cir. 1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)); *see*

4  *also Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).  "The opinion of a treating

5  physician is given deference because 'he is employed to cure and has a greater opportunity

6  to know and observe the patient as an individual.'" *Morgan v. Comm'r of the SSA*, 169

7  F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir.

8  1987) (citations omitted)).  "The ALJ may not reject the opinion of a treating physician,

9  even if it is contradicted by the opinions of other doctors, without providing 'specific and

10  legitimate reasons' supported by substantial evidence in the record." *Rollins v. Massanari*,

11  261 F.3d 853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.

12  1998)); *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Embrey v. Bowen*, 849

13  F.2d 418, 421 (9th Cir. 1988).  "The ALJ can meet this burden by setting out a detailed and

14  thorough summary of the facts and conflicting clinical evidence, stating his interpretation

15  thereof, and making findings." *Embrey*, 849 F.2d at 421 (quoting *Cotton v. Bowen*, 799

16  F.2d 1403, 1408 (9th Cir. 1986)).  Additionally, "[a] physician's opinion of disability

17  'premised to a large extent upon the claimant's own account of his symptoms and

18  limitations' may be disregarded where those complaints have been 'properly discounted.'"

19  *Morgan*, 169 F.3d at 602 (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989)

20  (citations omitted)).  Similarly, "[a] physician's opinion can be discredited based on

21  contradictions between the opinion and the physician's own notes." *Buck v. Berryhill*, 869

22  F.3d 1040, 1050 (9th Cir. 2017) (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir.

23  2005)).  "[T]he more consistent an opinion is with the record as a whole, the more weight

24  we will give to that opinion."  20 C.F.R. § 404.1527(c)(4).

25      The ALJ summarized the facts, opinions and medical evidence in this case.  AR at

26  30–36.  Regarding Dr. Weintraub's opinions, the ALJ observed that he gave them "limited

27  weight because they are not fully supported by the evidence of record."  *Id.* at 34.  In

28  support of this position, the ALJ reviewed Dr. Schenck's September 8, 2017 record and

observed that, "It is interesting that Dr. Schneck [sic] noted the claimant saw a colleague of his in Tucson, Arizona, Dr. Michael Miller, who could not find anything wrong with her left knee." *Id.* (citing Exhibit 26F/8). The ALJ also pointed to Dr. Weintraub's March 1, 2016 treatment note regarding Plaintiff's left knee doing well, with the arthroplasty in "excellent alignment without evidence of loosening[,]" although the right knee was becoming more painful. *Id.* at 34. The ALJ noted that in February 2017 Dr. Weintraub reviewed x-rays of Plaintiff's total knee arthroplasty which showed excellent alignment and no evidence of loosening. *Id.* The ALJ further noted Dr. Weintraub's admission that "[h]e did not know what was going on with the left knee." AR at 34. The ALJ also compared Dr. Weintraub's functional limitations with Plaintiff's activities of daily living, highlighting that Plaintiff's activities "d[id] not support Dr. Weintraub's postural limitations in particular" and that "the treatment record, including physical therapy notes . . . support[] a limitation to 2 minutes of standing." *Id.* at 35. The ALJ further observed that "objective findings do not provide a basis for limitations on handling, reaching, and feeling[,] [and] [t]he claimant's knee problems do not support such limits." *Id.* The ALJ concluded that "[t]here is nothing in the medical evidence of record that reflects the side effects mentioned by the doctor[,] [and] [t]he claimant made no mention of these type of adverse side effects at the hearing." *Id.*

The ALJ's findings are consistent with the medical records in this case. Dr. Weintraub's opinion contradicted his own notes and other treatment records. *See Buck v. Berryhill*, 869 F.3d 1040, 1050 (9th Cir. 2017) (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citations omitted). The ALJ provided "'specific and legitimate reasons' supported by substantial evidence in the record" to reject Dr. Weintraub's residual functional capacity opinion. *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001). Accordingly, he did not err.

. . .

1      **B.     *Plaintiff's Symptoms***

2              **1. Legal standard**

3              An ALJ must engage in a two-step analysis to evaluate a claimant's subjective

4    symptom testimony.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007).  First,

5    "a claimant who alleges disability based on subjective symptoms 'must produce objective

6    medical evidence of an underlying impairment which could reasonably be expected to

7    produce the pain or other symptoms alleged[.]'"  *Smolen v. Chater*, 80 F.3d 1273, 1281–

8    82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*)

9    (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir.

10   2014).  Further, "the claimant need not show that her impairment could reasonably be

11   expected to cause the severity of the symptom she has alleged; she need only show that it

12   could reasonably have caused some degree of the symptom."  *Smolen*, 80 F.3d at 1282

13   (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017).  "Nor

14   must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the

15   severity thereof.'"  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting

16   *Smolen*, 80 F.3d at 1282).  "[I]f the claimant meets this first test, and there is no evidence

17   of malingering, 'the ALJ can reject the claimant's testimony about the severity of her

18   symptoms only by offering specific, clear and convincing reasons for doing so.'"

19   *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v.*

20   *Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and

21   convincing" requirement had been excised by prior Ninth Circuit case law).  "While ALJs

22   obviously must rely on examples to show why they do not believe that a claimant is

23   credible, the data points they choose must *in fact* constitute examples of a broader

24   development to satisfy the applicable 'clear and convincing' standard."  *Id.* at 1018

25   (emphasis in original) (discussing mental health records specifically).  "This is not an easy

26   requirement to meet: 'The clear and convincing standard is the most demanding required

27   in Social Security cases.'"  *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc.*

28   *Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

## 2. ALJ findings

Here, the ALJ acknowledged the two-step process for assessing Plaintiff's symptom testimony.  AR at 30–31.  The ALJ observed that "[o]bjective findings support some level of functional limitation caused by physical impairment."  *Id.* at 32.  The ALJ then found that "[t]he claimant's statements about the intensity, persistence, and limiting effects of her symptoms are not fully consistent with the evidence of record."  *Id.*  The ALJ noted that Plaintiff "stated that the left total knee replacement in 2013 was not successful."  *Id.*  The ALJ further noted that Plaintiff traveled to Arizona and was seen by "Dr. Michael Miller, who could not find anything wrong with her left knee."  *Id.* (citations omitted).  The ALJ found this, coupled with Plaintiff's travel on a cruise to Central America, did not support her statement that that knee replacement was not successful.  AR at 32.  The ALJ acknowledged that Plaintiff had limitations, but found "[d]espite her limitations, she is able to prepare her own meals, care for her 3 dogs, perform personal care, do some household chores, drive a car, shop in stores, use a computer, socialize, and travel for pleasure[,] [as well as] . . . engage[] in water aerobics a few times a week[,] . . . clean[], launder[], sweep[], and make the beds."  *Id.*  The ALJ further found that Plaintiff's "ability to engage in these activities despite her allegations of severe, debilitating, chronic symptoms does not warrant greater limitations than provided for in the residual functional capacity."  *Id.*; *see Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007) ("whether the claimant engages in daily activities inconsistent with the alleged symptoms" is a proper factor for assessing a claimant's subjective pain and symptom testimony).

Furthermore, "evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra v. Astrue,* 481 F.3d 742, 751 (9th Cir.2007) (citations omitted).  Here, Plaintiff acknowledged the likely need for a replacement of her right knee, but chose more conservative treatment options.  *See, e.g.,* AR at 338, 342, 377, 412, 649.  The ALJ's "credibility finding is supported by substantial evidence in the record, [and as such,] we may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citations omitted).

1

2 **IV.   CONCLUSION**

3         Based upon the foregoing, the Court affirms the ALJ's decision.  Accordingly, IT

4 IS HEREBY ORDERED that:

5         1)      Plaintiff's Opening Brief (Doc. 14) is DENIED;

6         2)      The Commissioner's decision is AFFIRMED; and

7         3)      The Clerk of the Court shall enter judgment and close its file in this case.

8

9      Dated this 30th day of November, 2020.

10

11                                    Honorable Bruce G. Macdonald
                                      United States Magistrate Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28